Filed 11/15/13  Keilholtz v. Hertel CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ROBERT KEILHOLTZ et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> ROGER EDWIN HERTEL, <br><br> Defendant and Respondent. | D061198 <br><br> (Super. Ct. No.  37-2009-00051748-CU-NP-NC) <br><br> ORDER MODIFYING OPINION <br><br> [No Change in Judgment] |

THE COURT:

It is ordered that the opinion filed herein on October 31, 2013, be modified as follows:

1.  On page 4, the first full sentence is modified to read:

The homeowners whose unit had been damaged, Richard and Ronnie Abrams, sued the Association, individual members of the Board, and the property management company for causes of action related to the failure to maintain "all risk" coverage, including breach of fiduciary duty, fraud, negligent misrepresentation, suppression of fact, constructive fraud, conspiracy, and violation of Civil Code section 1365, which imposes certain duties on common interest associations with respect to notifying members regarding insurance policies maintained by the association.

2. On page 8, in the second paragraph, the first sentence is modified to read:

On July 25, 2003, the Abramses suffered a substantial water leak in their unit that caused damage to their condominium unit, as well as to common areas.

There is no change in the judgment.

_____
HUFFMAN, Acting P. J.

Copies to:  All parties

Filed 10/31/13  Keilholtz v. Hertel CA4/1 (unmodified version)
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ROBERT KEILHOLTZ et al., | D061198 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2009-00051748-CU-NP-NC) |
| ROGER EDWIN HERTEL, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Robert P. Dalquist, Judge.  Affirmed.

George McGill for Plaintiffs and Appellants.

Tharpe & Howell, Christopher Sherrill Maile and Eric B. Kunkel for Defendant and Respondent.

INTRODUCTION

Plaintiffs Robert Keilholtz et al. (plaintiffs)[1] appeal a judgment entered in favor of defendant Roger Edwin Hertel after the trial court granted Hertel's motion for summary judgment.  Plaintiffs, all of whom are homeowners of individual condominium units in the Las Brisas condominium complex, a mutual benefit condominium development, filed suit against Hertel seeking damages for breach of professional negligence, fraud, and/or negligent misrepresentation.

Hertel was the insurance agent for the nonprofit mutual benefit corporation, comprised of the homeowners (the Association), for a period of time.  The Association maintained an insurance policy through Truck Insurance Exchange (Truck) that protected against risks to both the common areas of the development as well as risks to the individual condominium units.  This type of policy is known as an "all risk" policy.

In May 2003, some members of the Association's Board asked Hertel how the Association could decrease its insurance costs.  Hertel suggested that the Association

---

[1]    According to the operative complaint, the named plaintiffs in this action include Keilholtz, Art Amberg, Lani Amberg, Joanne Oberlander, John Bernheisel, Carl Cannata, Olivia Cannata, Paula Capestro, Richard E. Cornwell, Frank Dilberto, Scott Dlugos, Jane Leigh Eden, George Duckworth, Maureen Duckworth, Harvey Finkelstein, Maureen Finkelstein, Joseph Galante, Phran Galante, Jack Harris, Janet R. Harris, Shirley Hough, Sheila Johnson, Julius S. Kerekes, Grace J. Kerekes, Joseph Largen, George McGill, Robert L. Mendenhall, Fred Nasseri, Mitra Nasseri, Orville "Tex" Newton, Shawna Aymont-Newton, Barbara E. Stangl-Phelps, Seymour Phillips, Barbara Phillips, Russell Russo, Carolyn S. Russo, Norman Schwartz, Fay Schwartz, Gordon Sarret, John Schnurer, Caroline Schnurer, Jayne W. Spencer, Erich Spillmann, Tiffany Spillman, and Jess Willson.

could change its policy from an "all risk" policy to one that covered only the common areas of the development, and not the individual units. This type of policy is known as a "bare walls" policy.

After this discussion, Hertel initiated a request with Truck to change the Association's insurance coverage from "all risk" to "bare walls." The parties dispute the circumstances under which this change request was initiated. There is no dispute, however, that Hertel sent the change request form to an employee of the Association's property management company for signature, and that it was that employee, and not any member of the Association's Board, who signed the form authorizing the change in coverage. After receiving the form, the insurance company implemented the change in coverage. Plaintiffs maintain that they did not know that the change had been made. Within weeks of the policy change from "all risk" to "bare walls," one of the units in the complex suffered water damage.

Just over a month after the property damage occurred, the Association held a meeting at which the membership discussed the benefits and drawbacks of amending the Association's governing documents to change a provision of the Association's Covenants, Conditions & Restrictions (CC&Rs) which, according to various statements made by some of those who were deposed in this case, required the Association to maintain an "all risk" policy. Hertel attended that meeting and did not mention that a change in the Association's policy from "all risk" to "bare walls" had already been effectuated.

In the meantime, the Association filed a claim with Truck for the water damage to the unit in the complex. The claim was eventually denied on the ground that the policy in

effect at the time of the property damage did not cover losses to the homeowners' individual units. The homeowners whose unit had been damaged sued the Association, individual members of the Board, and the property management company for causes of action related to the failure to maintain "all risk" coverage, including breach of fiduciary duty, fraud, negligent misrepresentation, suppression of fact, constructive fraud, conspiracy, and violation of Civil Code section 1365, which imposes certain duties on common interest associations with respect to notifying members regarding insurance policies maintained by the association. The action eventually settled, and, as part of the settlement, the Association agreed to pay the homeowners' attorney fees related to the action in an amount to be determined by the court. In order to cover the attorney fees that the court ultimately awarded, the Association imposed a special assessment on the remaining individual homeowners in the amount of $8,500 per unit.[2] In their action against Hertel, the individual homeowners sought to recover this special assessment from Hertel under theories of professional negligence, fraud, and/or negligent misrepresentation.

Hertel moved for summary judgment, or, in the alternative, summary adjudication, arguing, among other things, that he could not be liable to plaintiffs for professional negligence because he owed no duty to the individual plaintiffs. Specifically, Hertel

---

[2]     Although the operative complaint asserts that each plaintiff was "required to, and subsequently did, pay $8,500 each as assessed damages" and requests damages in the amount of $8,500 per plaintiff, it appears from another document in the record that the special assessment was imposed on a per-unit basis. This would mean that plaintiffs who jointly own a single condominium unit would have suffered a single $8,500 loss.

4

maintained that his client was the Association, not the individual plaintiffs, and that he was not in privity with the individual plaintiffs and therefore, owed no duty to them. Hertel further argued that the lack of any duty to the individual homeowners eliminated the possibility that they could recover against him on their negligent misrepresentation claim. Finally, Hertel maintained that the evidence demonstrated that some of the plaintiffs had learned of the coverage change around the time of the full Association meeting in August and took no action as a result, so they could not have justifiably relied on anything he said to them at that meeting. According to Hertel, the fact that plaintiffs did nothing after learning of the change in insurance coverage made it impossible for them to prevail on their claims for fraud and/or negligent misrepresentation.

The trial court agreed with Hertel that he owed no duty to plaintiffs, and concluded that this eliminated the possibility that plaintiffs could prevail on their professional negligence and negligent misrepresentation claims. The court also determined that plaintiffs' fraud claim failed because plaintiffs had not relied on statements that Hertel made at the August meeting, and thus, as a matter of law, they had suffered no damages as a result of his statements. The trial court granted summary judgment in Hertel's favor.

We conclude that although Hertel may have owed a duty to the individual homeowners to prevent the kind of damage suffered by the Abramses, i.e., an uninsured property loss due to the elimination, without notice, of insurance coverage for their individual units, this duty does not extend so far as to require him to use due care to prevent the kind of damage that the plaintiffs in this case allege they have suffered.

5

Because we conclude that the duty that Hertel owes to the individual homeowners is limited to a duty to use due care with respect to protecting their insurable interests, and that the harm alleged in this action is not harm to plaintiffs' insurable interests, we affirm the judgment in favor of Hertel as to the professional negligence cause of action.

We also affirm the judgment in favor of Hertel with respect to the claims for fraud and negligent misrepresentation. Because these claims are based on Hertel's conduct at a meeting that occurred *after* the individual condominium unit had already suffered a loss, and the only damages that plaintiffs claim result from the loss sustained by that unit and the subsequent litigation arising out of that loss, plaintiffs cannot establish that they were damaged by Hertel's failure to inform the homeowners at that meeting about the change in the Association's insurance coverage. We therefore affirm the judgment in Hertel's favor with respect to the fraud and negligent misrepresentation claims.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

Hertel is an insurance agent appointed by Truck to sell and offer insurance services related to policies issued by Truck. Hertel serviced policies that the Association purchased from Truck between 1993 and May 2008, with the exception of a period of time in 1996 and 1997.[3]

---

3    Hertel apparently also serviced some individual insurance policies for various homeowners in the Las Brisas development.

Under the Association's CC&Rs, the board of directors (the Board) was authorized to hire a property manager to assist the Board in managing the Association and the La Brisas property. Between 2000 and 2004, William Brooks, an employee of the Eugene Burger Management Corporation (EBMC), served as the property manager for the Association. One aspect of Brooks's duties as the property manager "was to deal with matters pertaining to the Association's insurance coverage." Brooks "was the person who dealt with H[ertel] regarding the Association's insurance coverage."

In March 2003, Truck issued an insurance policy to the Association. That policy was a "CONDOMINIUM PREMIER" policy, which provided for "all risk" coverage, including "condominium unit coverage." A specific endorsement for "UNIT COVERAGE" explained that the policy covered the individual units in the Las Brisas condominium development.

Hertel attended a meeting of the Association's Board on May 19, 2003. According to Hertel, members of the Board expressed concern about the rising costs of the Association's insurance premiums. Hertel suggested modifying the Association's policy to cover only "bare walls" as opposed to "all risk." He explained that such a change would reduce the premium. Hertel indicated that the CC&Rs might have to be amended to allow for such a change.

What happened next is the subject of much dispute. Hertel contends that in June 2003, Board member Seymour Phillips called Hertel and asked him to prepare a request to change the Association's policy from "all risk" to "bare walls." Phillips denied that this phone call occurred. Brooks, the property manager, stated in a declaration that the Board

7

president called Brooks and directed him to implement the change in the policy to "bare walls" coverage.

What is not in dispute is that at some point after May 19, Hertel sent a policy change request form to Brooks indicating a change in the Association's coverage from "all risk" to the reduced coverage for "bare walls." Brooks signed the form and returned it to Hertel, who submitted it to Truck. The change altered the March 2003 policy to the reduced "bare walls" coverage, retroactive to the date on which the policy went into effect. Plaintiffs maintain that they were not informed that this change had been made.

On July 25, 2003, condominium owners Richard and Ronnie Abrams suffered a substantial water leak in their unit that caused damage to their condominium unit, as well as to common areas. The Association submitted a claim for damages under its policy with Truck. Truck paid the portion of the claim for damage to the common areas, but denied the portion of the claim relating the interior of the Abramses' unit, on the ground that the policy provided only "bare walls" coverage.

On August 23, 2003, the Association held its annual meeting. The homeowners were still unaware that the Association's insurance coverage had been changed from "all risk" to "bare walls." Hertel was at the meeting and gave a presentation regarding the Association's insurance coverage, including a discussion of the benefits to the Association of reducing their coverage from "all risk" to "bare walls." Hertel did not mention that the Association's insurance coverage had already been reduced from "all risk" to "bare walls," even when he was specifically asked whether any change to the Association's coverage had been made. Apparently, just prior to the meeting, Brooks had

8

informed Hertel that the Association's CC&Rs had not been amended to allow for "bare walls" insurance coverage.[4]  No one else at the meeting disclosed the reduction in insurance coverage to the general membership that night.

Two days later, Hertel spoke with Brooks and told him how much it would cost to change the Association's insurance coverage back to "all risk."  On September 10, Hertel sent Brooks a written bid for changing the Association's policy back to "all risk" coverage.  Brooks met with the Board on September 15.  At that meeting, Brooks informed the Board members that a change from "all risk" coverage to "bare walls" coverage had been implemented in June 2003.

Because the change request initiated and implemented by Hertel and Brooks from an "all risk" policy to a "bare walls" policy had been implemented in contravention of the requirements of the Association's CC&Rs, on May 14, 2004, the Board voted to procure an "all risk" policy so that the Association's insurance would be in compliance with the CC&Rs.  Hertel prepared a policy change request form to procure "all risk" coverage for the Association, which was effective as of May 13, 2004.  The Board also sent a letter to the Association membership soliciting a vote to amend the CC&Rs to allow for the Association to maintain only a "bare walls" policy.  In the meantime, the Abramses retained counsel to represent them with respect to the water damage to their unit.  In

_____

4      Although a full copy of the La Brisas CC&Rs was never introduced in evidence in the trial court, and, as a result, a full copy is not in the record on appeal, from statements made by various witnesses, it appears that the CC&Rs required the Association to insure not only the common areas of the Las Brisas development, but also individual homeowners' units.

9

November 2003, the Abramses' attorneys sent a demand letter to the Association asking for damages in the amount of approximately $135,000 for remediation and construction costs. In July 2004, the Abramses' attorneys sent a second demand letter asking for approximately $170,000, including attorney fees. The Board apparently did not agree to pay the Abramses the amount of money that they were seeking. The Abramses proceeded to file a lawsuit against EBMC, the Association and some individual Board members in March 2005.

The Abrams litigation settled in May 2007. Pursuant to one term of the settlement, which was approved by the Board, the Association agreed to pay any amount in excess of $70,000 that the court might award on a motion for attorney fees and costs.[5] The trial court ultimately awarded the Abramses approximately $365,000 in attorney fees and costs, and entered judgment for that amount in their favor and against the Association.

In order to pay the judgment, the Association imposed a special assessment of $8,500 per unit.

---

[5] Under this term of the settlement agreement, Truck, which was involved in the litigation as the Association's insurer, agreed to pay $70,000 in attorney fees, and the Association agreed to pay any additional amount of attorney fees and costs awarded to the Abramses in excess of $70,000.

B.    *Procedural background*

Plaintiffs filed their original complaint in 2009.  After various demurrers and motions to strike, plaintiffs ultimately filed the operative complaint, a third amended complaint (TAC), in November 2010.

Hertel moved for summary judgment, or, in the alternative, summary adjudication.  Plaintiffs opposed the motion.

The trial court concluded that Hertel did not owe plaintiffs a duty of care, and that, as a matter of law, plaintiffs had not relied on Hertel's statements at the meeting and had suffered no damages as a result of his statements.  The court determined that plaintiffs thus could not prevail on their claims for professional negligence, negligent misrepresentation, or fraud.  The trial court granted Hertel's motion for summary judgment, and entered judgment in favor of Hertel.  Plaintiffs moved for a new trial, but the court denied the motion.  Plaintiffs thereafter filed a timely notice of appeal.

III.

DISCUSSION

Plaintiffs contend that the trial court erred in granting summary judgment in favor of Hertel because, they maintain, the trial court was incorrect in concluding that Hertel did not owe them a duty of care, as a matter of law, and there remained triable issues of fact with respect to all three of their claims against Hertel.

11

A. *Summary judgment standards*

A moving party is entitled to summary judgment when the party establishes that it is entitled to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant may make this showing by demonstrating that the plaintiff cannot establish one or more elements of all of his causes of action, or that the defendant has a complete defense to each cause of action. (*Towns v. Davidson* (2007) 147 Cal.App.4th 461, 466.)

"An issue of fact can only be created by a conflict of evidence. It is not created by 'speculation, conjecture, imagination or guess work.' [Citation.] Further, an issue of fact is not raised by 'cryptic, broadly phrased, and conclusory assertions' [citation], or mere possibilities [citation]. 'Thus, while the court in determining a motion for summary judgment does not "try" the case, the court is bound to consider the competency of the evidence presented.' [Citation.]" (*Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196–197.)

In reviewing a trial court's ruling on a motion for summary judgment, an appellate court makes " 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law. [Citations.]' [Citation.]" (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1143.)

12

B.    *The professional negligence cause of action*

Plaintiffs contend that the trial court erred in determining that that Hertel owed them no duty of care, as a matter of law.

"The elements of a cause of action for professional negligence are (1) the existence of the duty of the professional to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) breach of that duty; (3) a causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional negligence. [Citation.]" (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.)

1.    *Whether Hertel owed plaintiffs a duty of care that extends to the protection of their noninsurable economic interests*

Hertel contends that the trial court correctly concluded that he owed plaintiffs no duty, as a matter of law. Hertel further contends that the trial court's decision to grant summary adjudication of this claim was correct because even if he owed plaintiffs a duty of due care, the evidence demonstrates, as a matter of law, that he did not breach that duty and/or that his actions were not the proximate cause of plaintiffs' damages.

There is no dispute that Hertel's client was the Association and not plaintiffs—the individual members who make up the Association. The parties disagree as to whether Hertel owed the individual members of the Association a duty of due care, such that he may be found liable to them with respect to the economic loss that they are claiming.

"The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against

13

unintentional invasion. [Citations.] Whether this essential prerequisite to a negligence cause of action has been satisfied in a particular case is a question of law to be resolved by the court. [Citation.] [¶] A judicial conclusion that a duty is present or absent is merely ' "a shorthand statement . . . rather than an aid to analysis . . . . '[D]uty,' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." ' [Citation.] 'Courts, however, have invoked the concept of duty to limit generally "the otherwise potentially infinite liability which would follow from every negligent act . . . ." ' [Citation.]" (*Bily v. Arthur Young & Co*. (1992) 3 Cal.4th 370, 397 (*Bily*).)

A duty of care may arise through statute, contract, the general character of the activity, or the relationship between the parties. (*J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 803 (*J'Aire Corp.*).) "The determination whether in a specific case the defendant will be held liable to a third person not in privity *is a matter of policy and involves the balancing of various factors*, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm. [Citations.]" (*Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 (*Biakanja*), italics added.)

In *Biakanja*, *supra*, 49 Cal.2d at pages 650-651, the Supreme Court permitted recovery by a third party beneficiary, i.e., the intended beneficiary of a will prepared for the decedent by the defendant notary public. The notary public failed to have the will

14

properly attested, rendering the will unenforceable. The Supreme Court concluded that the notary owed a duty to an intended beneficiary, and not only to the notary's client, to properly handle the will's drafting and solemnization. (*Ibid*.)

Later, in *J'Aire Corp., supra,* 24 Cal.3d 799, the Supreme Court applied the *Biakanja* factors to conclude that the tenant of a building used as a restaurant could state a cause of action for negligence against a renovation contractor hired by the building's owner for business income lost when the contractor "fail[ed] to complete the project with due diligence." (*J'Aire Corp., supra,* at p. 802.) The Supreme Court held that a "special relationship" (*id.* at p. 804) that permitted the recovery of economic losses (i.e., the relationship defined by the *Biakanja* test) existed between the contractor and the tenant. The court dismissed concerns that such a theory of recovery would allow for the imposition of liability out of proportion to fault, for potentially remote consequences and speculative damages. (*J'Aire Corp., supra*, at pp. 807-808.) In the court's view, the *Biakanja* factors, in combination with "ordinary principles of tort law such as proximate cause," were "fully adequate to limit recovery" of purely economic damages "without the drastic consequence of an absolute rule which bars recovery in all such cases." (*J'Aire Corp., supra,* at p. 808.)

In both *Biakanja* and *J'Aire Corp.*, the question that the courts addressed was whether the defendant's duty of care could be extended to a third party who was not in privity with the defendant—i.e., the intended beneficiary of a will (*Biakanja*, *supra*, 49 Cal.2d at pp. 648–649) and the lessee of premises that the defendant was renovating

15

(*J'Aire Corp.*, *supra*, 24 Cal.3d at p. 802)—for injuries alleged to have been suffered by those third parties.

To determine whether Hertel owed plaintiffs a legally recognized duty to use due care to protect their interests in avoiding a"special assessment" to pay for the attorney fees award in the Abrams litigation, we will apply the six factors identified in these cases. These six factors, however, do not end our inquiry as to whether Hertel owed a duty to use due care to protect the interest at stake in this case.  In *Bily, supra,* 3 Cal.4th 370, the Supreme Court concluded that three additional factors should be considered in determining, in that case, whether accountants owed a general duty of care to investors who, in making their investments, foreseeably relied on an audit opinion that the investors alleged had been negligently prepared: 1) whether there existed the risk of imposition of liability out of proportion to fault; 2) the possibility that the plaintiff might take protective measures to guard against the risk (private ordering); and 3) whether it would be most efficient to place the loss on the class of defendants involved rather than the plaintiffs.  (*Id.* at pp. 398-407.)  Other courts have considered these additional *Bily* factors in determining whether a professional negligence claim may be brought by a third party not in privity with the defendant for an injury alleged to have arisen as a result of the professional's lack of due care.  (See *Giacometti v. Aulla, LLC* (2010) 187 Cal.App.4th 1133, 1137-1138 [concluding that an accounting firm does not have a duty of care to its client's employees when hired to prepare W-2 wage and tax statements for the client]; *Weseloh Family Ltd. Partnership v. K.L. Wessel Construction Co*. (2004) 125

16

Cal.App.4th 152, 165-166, 170-172 [concluding that design engineers did not owe the property owner or the general contractor a duty of care].)

The application of the combined nine *Biakanja/Bily* factors to determine whether a duty of care is owed to a particular third party who has suffered economic damages is a legal question that is decided on a case-by-case basis. (See *Aas v. Superior Court* (2000) 24 Cal.4th 627, 644; *Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594, 1610.) We consider these factors in turn.

### a. *The* Biakanja *factors*

#### i. *The extent to which the transaction was intended to affect the plaintiffs*

Citing *Desert Healthcare District v. PacifiCare FHP, Inc.* (2001) 94 Cal.App.4th 781, Hertel notes that in considering this first factor, "[t]he conduct alleged to have been negligent must have been intended to affect that particular plaintiff, rather than just a class of persons to whom the plaintiff happens to belong." (*Id*. at p. 792.) Hertel asserts that because the "transaction in question was the processing of a request by the *Association* to reduce the coverage offered by the *Association's* policy from 'all risk' to 'bare walls,' " the transaction was "not intended to affect the homeowners as individuals, but instead their *association*." However, the record demonstrates that the conduct that plaintiffs allege was negligent *was* intended to affect plaintiffs in this case.

Hertel was the Association's insurance agent and, in that capacity, assisted the Association in procuring insurance policies to meet the Association's needs. In particular, Hertel assisted the Association in procuring and maintaining an insurance

17

policy that specifically and directly affected each individual homeowner member of the Association. Prior to the change request at issue in this case, the Association's policy was an "all risk" policy. As such, the policy provided coverage for each homeowner's individual unit, *not* only for the common areas owned by the homeowners collectively. Thus, the transaction at issue—Hertel's effectuation of a change intended to eliminate the coverage for the individual units— clearly was intended to affect these plaintiffs, since it effectively eliminated the insurance coverage that they had prior to the change. Because of the nature of the "all risk" policy, Hertel and everyone else involved in making a change from "all risk" to "bare walls" coverage, had to know that this transaction would specifically affect the individual homeowners of the Las Brisas development by eliminating the insurance coverage for their units.

Hertel acknowledges that where "a transaction is in fact intended to specifically affect the plaintiff" there is "cause to consider a departure from the general rule that there is no duty to guard against economic loss." However, Hertel maintains that the transaction was intended to affect the Association and not the individual homeowners. Although there is a legal distinction between the Association and its membership, it is disingenuous to suggest that the effect on the homeowners from the insurance change requested in this case was "merely collateral," as Hertel asserts. The change did not affect only the insurance coverage for the development's common areas, but rather, specifically *eliminated* each individual homeowner's insurance coverage for his or her unit.

18

Hertel cites *Adelman v. Associated Internat. Ins. Co* (2001) 90 Cal.App.4th 352, 366 (*Adelman*), as supporting his position with respect to this factor, however, our reading of the *Adelman* court's analysis suggests that it actually supports our conclusion with respect to this factor. *Adelman* addressed whether an insurer may "be subject to liability to a noninsured third party for the negligent performance of its indemnity obligations to the named insured based upon allegations that there is a 'special relationship' between the insurer and the third party, as that term has been defined and applied in [*Biakanja*]*, supra*, 49 Cal. 2d 647 and its progeny." (*Adelman*, *supra*, at p. 359.) In *Adelman*, a homeowners' association (HOA) had procured an insurance policy that "provided coverage for losses from various perils, including earthquake damage," and that "covered the common areas of the project but did not extend coverage to the individual units owned by the plaintiffs." (*Id*. at p. 356.) After the buildings in the complex suffered earthquake damage, the HOA made a timely and proper claim under the policy seeking the funds necessary to pay to repair damage caused to the common areas of the project. However, the insurance company failed to make the requested repairs or to provide the funds necessary to complete the repairs. (*Id*. at p. 357.) Because these structural repairs had to be made before the individual homeowners could commence repairs to their individual units, the homeowners "were forced to incur the expense of finding other living quarters, or to live amidst disrepair, and suffered significant diminution in the value of their units." (*Ibid*.)

The individual homeowners sued the insurance company, seeking compensation for the expenses that they incurred as a result of the insurance company's failure to timely

and fully perform its obligations under the policy. (*Adelman*, *supra*, 90 Cal.App.4th at pp. 357-358.) In assessing the *Biakanja* factors and applying them to the situation before it, the *Adelman* court concluded that issuance of the insurance policy in that case was not intended to affect the homeowners individually: "By its express terms, the policy, although purchased with plaintiffs' homeowner assessment funds, covered only the *common areas* of the project; in short, the policy was intended to protect the collective or group interests of the plaintiffs, *not* their individual interests. Plaintiffs do not credibly claim otherwise. The policy was purchased in the name of the HOA, which is the statutorily designated entity formed to protect and enforce the plaintiffs' collective or group interests. . . . Given this circumstance, it can hardly be said that the 'end and aim' of the policy's purchase was the protection of plaintiffs' *individual* interests." (*Adelman*, *supra*, at p. 366.)

In contrast to the policy at issue in *Adelman*, the "all risk" policy that Hertel is alleged to have changed to a "bare walls" policy without proper authorization covered not only the common areas of the development but also each of the individual homeowners' units. The "all risk" policy in this case clearly was intended to protect not only the collective interests of the plaintiffs, but also their individual interests. Given the specific nature of the policy at issue, and the intended effect of the change request, which was to eliminate entirely the protection for the homeowners' individual units, we conclude that the first factor weighs in favor of finding the existence of a duty.

20

ii.    *Foreseeability of harm to the plaintiffs*

The next factor we consider is whether the harm that these plaintiffs suffered was foreseeable.  It was clearly foreseeable that a change in the policy coverage from "all risk" to "bare walls" could cause harm to individual homeowners, particularly if the homeowners were not informed of the change.  Plaintiffs would have had no reason to procure replacement insurance to protect their individual interests if they reasonably believed that the Association maintained an insurance policy that provided coverage for their units.  Those persons who were involved in eliminating the coverage for plaintiffs' individual units could have foreseen that the individual homeowners might incur a loss that would not be covered by the Association's new "bare walls" policy.

However, the harm for which plaintiffs seek to recover in this case is not damage to any of their individual units.  Rather, plaintiffs seek compensation for the costs of litigation and a resulting settlement that was triggered by foreseeable damage to the Abramses' unit.  The damage for which plaintiffs seek compensation is far less foreseeable than direct, uninsured property damage to a homeowner's individual unit.  Multiple intervening events had to occur in order for these plaintiffs to have suffered the damages that they are seeking to recover here.  Unlike the property damage suffered by the Abramses—damage to their unit that was uninsured due to the change in the Association's policy from "all risk" to "bare walls,"—the monetary damage suffered by plaintiffs was far less foreseeable.

We conclude that, on the whole, this factor weighs against imposing a duty on Hertel with respect to the damages that plaintiffs seek in this case.

21

### iii.	*Degree of certainty that plaintiffs suffered injury*

Plaintiffs clearly suffered injury. While the CC&Rs required that the Association maintain an insurance policy that covered both common areas and the homeowners' individual units, the policy was changed without proper amendment of the CC&Rs, and without plaintiffs' knowledge or consent. After the change occurred, one unit suffered physical damage. Because the Association's policy had been changed, the Abramses, who owned the unit that sustained the damage, had no insurance to cover the costs to repair their unit. The Abramses sued the Association, members of the Board, and the property management company. As a result of that lawsuit, plaintiffs, all individual homeowners and members of the Association were required to pay a special assessment to cover a portion of the settlement reached in the Abrams litigation. This factor thus weighs in favor of finding a duty owed by Hertel to plaintiffs to protect their interests under these circumstances.

### iv.	*Closeness of connection between defendant's conduct and the injury suffered*

With respect to the closeness of the connection between Hertel's acts and plaintiffs' injuries, Hertel's alleged initiation of the change request that eliminated the insurance coverage for the individual units in the Las Brisas community was clearly a causal factor of the *Abramses'* loss. However, the causal connection between Hertel's alleged conduct and the subsequent special assessment imposed on the Association's membership to pay for the Association's settlement of the Abrams litigation is far more attenuated.

22

As Hertel argues, there is not a *close* connection between his actions and plaintiffs' injuries. The loss that plaintiffs incurred was a share of the cost of an open-ended settlement with the Abramses that the Board authorized after failing to settle on more favorable terms at an earlier point in the litigation. If the Association had handled the Abrams matter differently, there may have been no need to impose an assessment on plaintiffs. Because Hertel's actions were not closely connected with the circumstances that led to the imposition of the special assessment, this factor weighs against a determination that Hertel owes plaintiffs a duty with respect to their injury.

> v.     *The moral blame attached to defendant's conduct*

Hertel's alleged deviation from the standard of care in his industry is not particularly blameworthy. His conduct did not present a risk to health or safety, and, unlike the defendant's conduct in *Biakanja*, was not unlawful. The harm that Hertel's actions may have caused was solely economic. Hertel's conduct therefore does not stand out as morally blameworthy. This factor thus weighs against finding that Hertel owed a duty to plaintiffs with respect to their injury.

> vi.     *The policy of preventing future harm*

The final *Biakanja* factor is the policy of preventing future harm. Where CC&Rs require that an HOA provide insurance coverage that protects not only common areas but also the individual units of its members, one who assisted that HOA in procuring and maintaining such coverage knows that changing that coverage to "bare walls" coverage

23

will impact those individual homeowners and may have a potentially drastic affect on them.

Plaintiffs allege that Hertel initiated the change request without proper authorization, either at the suggestion of someone who did not have the authority to make such a request, or out of a mistaken belief that he had been asked to do so. Plaintiffs further allege that Hertel initiated the change knowing that the CC&Rs may have required the Association to maintain "all risk" coverage yet failing to determine whether the CC&Rs had been amended to allow for the elimination of individual unit coverage. If a fact finder determines that these allegations are true, imposing liability could act as an incentive to others to ensure that such significant changes to HOA insurance policies are not effectuated unless such changes are requested by the appropriate individuals and there has been some minimal offer of proof that the requested changes have been authorized by the governing documents and/or governing body of that association. We therefore conclude that the policy of preventing future harm weighs slightly in favor of recognizing a duty on Hertel's part that extends beyond protecting only the plaintiffs' insurable interests, and that would impose liability on him for failing to prevent the type of harm plaintiffs have alleged they suffered.

        b.     *The* Bily *factors*

            i.     *The possibility that liability might be imposed out of all proportion to fault*

The *Bily* court determined that imposing a duty under the scenario presented in that case could have vastly expanded the number of possible plaintiffs and the types of

24

claims against the auditor, thereby "rais[ing] the spectre of multibillion-dollar professional liability that [wa]s distinctly out of proportion to" the auditor's fault and the connection between the auditor's conduct and the investors' injury (*Bily*, *supra*, 3 Cal.4th at p. 402). In this case, imposing a duty would not raise similar concerns. The nature of the duty that the plaintiffs in *Bily* sought to impose would have created potentially limitless exposure for the auditor, despite the fact that the auditor's role in the financial reporting process was secondary, in that most of the information on which an auditor relies necessarily comes from the client, and involves complex professional judgment. (*Id*. at p. 400.) In contrast, the number of potential plaintiffs to whom an insurance agent such as Hertel would owe a duty is limited. Specifically, only where an HOA's insurance policy protects the individual interests of the homeowners in addition to their common or collective interests, would an insurance agent have a duty to meet the standards of his profession with respect to those homeowners.

Further, the *Bily* court was concerned that auditors could be left as the sole parties from whom investors could recover if the court were to impose a duty on them, noting that by the time investors have determined that they have been damaged, "[t]he client, its promoters, and its managers have generally left the scene, headed in most cases for government-supervised liquidation or the bankruptcy court," such that the "auditor has . . . assumed center stage as the remaining solvent defendant and is faced with a claim for all sums of money ever loaned to or invested in the client." (*Bily*, *supra*, 3 Cal.4th at p. 400.) Here, there are multiple parties who could be found to bear responsibility for the losses that plaintiffs suffered. In fact, it is possible that a fact finder would conclude that

25

Hertel is not solely liable, and that he should be held responsible for only a portion of the damages that plaintiffs seek. Including Hertel as one of multiple parties owing a duty to plaintiffs and allowing for liability for failing to protect would not be out of all proportion to any fault that he may be found to bear.

ii. *The level of sophistication of the plaintiff in the context of the transaction, including the potential for "private ordering" to contractually protect against the risk*

The *Bily* court distinguished the class of third party investors, creditors, and others who read and rely on audit reports and financial statements, from ordinary consumers. (*Bily*, *supra*, 3 Cal.4th at p. 403.) The court noted that, unlike the " 'presumptively powerless consumer' " in product liability cases, more sophisticated investor/creditor plaintiffs have the ability to " 'privately order' the risk of inaccurate financial reporting," either through their own investigation or audit, or by contractual arrangements with the client. (*Ibid.*) The *Bily* court observed, "As a matter of economic and social policy, third parties should be encouraged to rely on their own prudence, diligence, and contracting power, as well as other informational tools. This kind of self-reliance promotes sound investment and credit practices and discourages the careless use of monetary resources. If, instead, third parties are simply permitted to recover from the auditor for mistakes in the client's financial statements, the auditor becomes, in effect, an insurer of not only the financial statements, but of bad loans and investments in general." (*Ibid.*) Thus, in a financial transaction that presents a risk of loss, a party contemplating the transaction should be encouraged to take appropriate steps to protect his or her own interests through prudence, diligence and contracting power.

26

The individual homeowners who are suing Hertel in the present case are not like the sophisticated investors who brought suit against an auditor in *Bily*. The individual homeowners have a special relationship with both the Association representing them, as well as with the insurance agent who obtained the "all risk" insurance policy for the Association—a policy that specifically provided protection for the homeowners' risk of loss to their individual units—and who acted to change that policy in a way that eliminated this protection. The homeowners were in a uniquely vulnerable position with respect to the transactions at issue in this case in that under the terms of the Association's CC&Rs, the homeowners justifiably relied on the Association and the insurance agent to protect their individual interests. Although the homeowners could have purchased additional insurance to provide back-up coverage for the risk of damage to their individual units, this would have been economically inefficient since such risks were covered by the Association's "all risk" policy. Procuring additional insurance in this circumstance would have been redundant. Under these circumstances, the *Bily* consideration of "private ordering" does not counsel against imposing a duty on Hertel toward the individual homeowners.

  iii.  *The potential adverse impact on the class of defendants on whom the plaintiffs seek to impose a duty*

The *Bily* court was particularly concerned that imposing liability on auditors would not only fail to create "a significant and desirable improvement in audit care," but would also likely cause "deleterious economic effects." (*Bily*, *supra*, 3 Cal.4th at p. 404.) The *Bily* court explained, "In view of the inherent dependence of the auditor on the client

27

and the labor-intensive nature of auditing, we doubt whether audits can be done in ways that would yield significantly greater accuracy without disadvantages." (*Ibid*.) It is unclear whether such a concern makes sense in this case. Rather, it would appear that there could be fairly simple things that an insurance agent could do differently in a situation like the one in this case to ensure greater "accuracy" in changing HOA insurance coverage, with little downside. Specifically, an insurance agent could request verification of a change request to an "all risk" policy from an HOA's board, or could request to see the minutes of the board actions authorizing such a change. Such efforts would be minimal, would be unlikely to decrease the availability of agents willing to assist HOAs in procuring coverage, and would help prevent the kind of unintended lapse in insurance coverage that occurred here. For these reasons, we conclude that this factor minimally weighs in favor of imposing a legal duty on Hertel for which the homeowners had to pay a special assessment as a result of the litigation over the uninsured loss to the Abramses' unit.

         c.     *Consideration of all the factors leads to the conclusion that Hertel did not owe the individual homeowners a duty with respect to the injury that they are claiming*

While some of the *Biakanja/Bily* factors weigh in favor of imposing a duty on Hertel, the most significant of the factors—specifically, the foreseeability of the particular harm for which recovery is sought and the closeness of connection between the defendant's conduct and the injury alleged—counsel against imposing a duty on Hertel in this case. In our view, having concluded that it was not reasonably foreseeable that Hertel's alleged conduct would result in the kind of injury suffered by plaintiffs here, and

28

that his alleged conduct is not closely connected to the injury alleged, it would be unreasonable to impose liability on Hertel for such damages.[6]

Hertel's duty to use due care as an insurance agent does not extend to protecting the individual homeowners from harm beyond harm to their *insured interests*. The damages for which plaintiffs seek compensation in this case—damages from a special assessment imposed on them as a result of the settlement of the Abrams litigation—are not within the scope of this duty. Although we disagree with the trial court's conclusion that Hertel would never owe any duty at all to the individual homeowners, we nevertheless conclude that under the circumstances alleged in this case, the trial court did not err in granting summary adjudication in favor of Hertel on plaintiffs' professional negligence claim.

C.      *The fraud and negligent misrepresentation causes of action*

Plaintiffs contend that the trial court erred in granting summary adjudication in favor of Hertel on their second and third causes of action for fraud and negligent misrepresentation.[7] We reject this contention.

---

[6]      Although *Biakanja* and *Bily* do not suggest that any of the factors are more important than others, in our view, the foreseeability of the harm at issue and the closeness of the connection between the defendant's conduct and the harm suffered should be the first factors to be addressed in determining whether a defendant has a duty to use due care toward an interest of another who is not in privity with the defendant. If a court were to conclude that the harm suffered by the plaintiffs was not a reasonably foreseeable consequence of the defendant's conduct and that the defendant's conduct was not closely connected to the harm suffered, then it would not be reasonable to impose liability on the defendant, regardless of whether some or all of the other factors might counsel in favor of imposing liability.

29

Both the second and third causes of action are based on Hertel's conduct at the August 23, 2003 annual meeting, and not on his June 2003 conduct in initiating the change request. Plaintiffs allege that property manager Brooks invited Hertel to speak to the Association's membership at the August 2003 meeting. At that meeting, Hertel gave a presentation in which he expounded on the merits of changing the association's insurance policy from "all risk" to "bare walls" coverage. Plaintiffs allege, and Hertel does not dispute, that he did not inform anyone at the meeting that the Association's policy had already been changed to a "bare walls" policy prior to the meeting, and thereby implied, at a minimum, that the policy that was in effect at the time of the meeting was an "all risk" policy. One member asked Hertel "if any change in insurance coverage had as yet been effected, and" in reply, Hertel represented that no change in the policy had been effectuated.[8] The Association membership voted not to change the policy to a "bare walls" policy at that meeting.

---

[7]    Neither party took great pains to address the propriety of the trial court's granting of summary adjudication in favor of Hertel on these two causes of action. In fact, plaintiffs originally contended in briefing that a reversal as to their first cause of action would necessarily extend to the second and third causes of action. As will become clear, we disagree with this assessment, and are dismayed that the parties devoted so little attention or analysis to the question whether Hertel was entitled to judgment on these causes of action.

[8]    The parties dispute what Hertel's and Brooks's motives were in not telling the members of the Association at this meeting that the insurance policy had already been changed. Hertel states that "[b]ecause of what Brooks told me [i.e., that there had been water loss in a unit, the CC&Rs had not been amended to allow for bare walls coverage, and the Association membership was in the process of collecting ballots to amend the CC&Rs to allow for a reduction in coverage], and my confusion as to the import of what

30

The elements of fraud, which give rise to the tort action for deceit, are (1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) justifiable reliance, and (5) resulting damage. (*Small v. Fritz Companies, Inc*. (2003) 30 Cal.4th 167, 173 (*Small*).) The tort of negligent misrepresentation, another species of the tort of deceit (*Bily, supra,* 3 Cal.4th at p. 407), does not require the intent to defraud but only " '[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true.' " (*Small*, *supra*, at p. 174.) The elements of negligent misrepresentation are "(1) the misrepresentation of a past or existing material fact, (2) without reasonable grounds for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damages." (*Apollo Capital Fund LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 243.)

In order to establish fraud or negligent misrepresentation, plaintiffs must demonstrate that they were damaged as a result of Hertel's misrepresentations. Even assuming that everything that the plaintiffs' assert is true—i.e., that Hertel misrepresented in August 2003 that no change had been effectuated, and that plaintiffs and members of the Board remained unaware of the change until months later, in or around approximately November 2003—plaintiffs have not identified any harm that they suffered as a result of

---

he told me, I did not tell the unit owners present" about the change request that he had submitted to Truck.

31

having been kept in the dark about the change in coverage between August and November.

The Abramses' property loss occurred in June 2003, *after* the insurance coverage change had been effectuated but *prior* to Hertel's misrepresentation at the August 2003 meeting. All of the damages that plaintiffs seek arise out of their having to pay for the settlement of the Abramses' claims against the Association resulting from their property loss. Although the evidence demonstrates that Hertel's statements at the August meeting were false, that he knew they were false, and that he intended that plaintiffs rely on the statements and vote to amend the CC&Rs to permit a change in coverage from "all risk" to "bare walls," there is no evidence that plaintiffs' reliance on these statements caused any additional damage to them.[9] In other words, the damage that the plaintiffs ultimately suffered arose as a result of the property loss suffered by the Abramses during a time period when the Association's insurance coverage had been reduced from "all risk" to "bare walls." The conduct that caused the property loss to be uninsured and that caused the Abramses to initiate litigation against the Association was the implementation of a change in the Association's insurance policy from "all risk" to "bare walls," which occurred in June 2003. Hertel's misrepresentations in August 2003 that plaintiffs allege prevented the Board and other members of the Association from learning that the

---

[9] It seems clear from the facts in evidence on summary judgment that Hertel did, in fact, misrepresent the nature of the Association's policy at the August 23, 2003 meeting. We do not intend to suggest that such conduct was reasonable or condonable. Rather, we simply conclude that there remain no material issues in dispute with respect to whether Hertel's misrepresentation at that meeting caused plaintiffs' identified damages.

insurance policy had been changed did not lead to plaintiffs' having to pay $8,500 each to cover the settlement with the Abramses.

Further, there is no evidence in the record that suggests that plaintiffs suffered any additional, separate injuries as a result of Hertel's misrepresentations at the August 2003 meeting. Rather, in the operative complaint, plaintiffs assert that if Hertel had not misrepresented at that meeting that no change in coverage from "all risk" to "bare walls" had already occurred, (1) they could have "take[n] prophylactic steps [on] their own behalf (such as the obtaining of additional condominium interior and contents coverage to protect against the 'gap' created by the reduction to only 'bare walls' coverage)," and (2) they "would also have been able to intervene informally with [the insurance company[10]], or if necessary, later file a complaint in intervention in the Abrams litigation, all in an effort to secure reversion to 'All-Risk' coverage from the unauthorized 'bare walls' coverage." Plaintiffs contended that if they had been able to do either of these things, they could have avoided the $8,500 special assessment. As evidence supporting their contention that Hertel's misrepresentations at the August 2003 meeting caused damage to them, plaintiffs refer to the declaration of Russell Russo, a Las Brisas homeowner and one of the plaintiffs. Russo, who was present at the August 2003 meeting, states, "Had I not been of this belief that the full, 'all risk' coverage remained in effect—a belief based

_____

10    In their pleadings and other documents, plaintiffs refer to the insurance company as "Farmers." From the record it appears that Farmers and Truck are related entities, but the parties do not discuss the relationship between the two, and no one has raised this as an issue. In their briefing in response to Hertel's motion for summary judgment, plaintiffs do not dispute the fact that at the relevant time period, the Association was insured under a Truck insurance policy.

primarily upon Hertel's representation, which I now know to have been false—I would certainly have insisted that the Las Brisas HOA Board commence litigation against [the insurer] at once, by an action for declaratory or other relief, to judicially compel [the insurer] to immediately effect reinstatement of the 'all risk' coverage. I knew that such a court action would be successful, probably by summary judgment, because the alleged change to 'bare walls' had been utterly and completely lacking in any proper authorization, either by 'Board action' or by the required CC&R amendment . . . ."

We find these assertions of injury meritless. First, no injury can be traced to the homeowners' inability to obtain individual insurance for their condominium units *after* the August 2003 meeting at which Hertel misrepresented the Association's coverage. As noted, the only property damage to which plaintiffs have pointed that resulted in the Association members having to pay a special assessment is the uninsured property damage suffered by the Abramses. The change in the policy from "all risk" to "bare walls," and the Abramses' subsequent property loss, both occurred *prior* to the August 2003 meeting. The plaintiffs thus have not demonstrated, and cannot demonstrate, that their damages resulted from not having had the opportunity to obtain property insurance to cover their individual risk due to misrepresentations made by Hertel in August 2003.

Second, although the plaintiffs assert that they would have intervened in the Abrams litigation or would have filed suit against Truck directly, there is no evidence that they did either of these things even after members of the Board and/or Association became aware in November 2003 that the Association's policy had been changed to "bare walls." In a letter dated November 10, 2003, an attorney for the Abramses advised the

34

Association that its policy had been changed from "all risk" to "bare walls," effective April 3, 2003, and that the Abramses planned to seek compensation from the Association. Plaintiffs do not dispute the contents of this letter, or that it was received by members of the Association, including one of the named plaintiffs, Robert Keilholtz, who in his deposition admitted to knowing about the change in coverage when he learned of the Abramses' plan to seek compensation from the Association. Keilholtz also admitted that "the first time we were made aware, me personally and most of the board members and most of the HOA members, was at the time that [the Abramses] had a loss and that we found out that we probably wouldn't have coverage," which occurred during Keilholtz's 2003-2004 service as a Board member. Despite learning of the change in the policy from "all risk" to "bare walls" in or around November 2003, at no point in time did any of the plaintiffs file a lawsuit against Truck or attempt to intervene in the Abrams litigation. There is nothing to suggest that plaintiffs were prevented from doing these things as a result of being unaware of the true nature of the Association's insurance coverage between August 2003 and November 2003. They have not asserted that any cause of action that they may have possessed became time-barred as a result of the delay in their learning about the coverage change, that any defense they may have had to the Abramses' claims was lost during the few months' time when they remained unaware that their insurance coverage had been reduced, or that their ability to properly litigate or defend such claims was hindered as a result of any loss of evidence caused by the delay in their knowing about the change in coverage.

35

Finally, with respect to plaintiffs' allegation that they suffered damages in the amount of $8,500 per unit for attorney fees paid in settlement of the Abramses' claims because Hertel's misrepresentations at the August 2003 meeting prevented them from intervening "informally" with Truck before Truck assumed its defensive position with respect to the Abramses' loss, this contention is entirely speculative. Even if plaintiffs could prove that they would have attempted to intervene "informally" with the insurance company to attempt to get it to agree to cover a loss suffered at a time when the effective policy did not provide coverage, they could not establish that anything they might have done would in fact have resulted in Truck agreeing to cover the Abramses' individual property damage, thereby eliminating the need for the Abramses to file suit against the Association and the Association's subsequent need to settle the Abramses' claims.

There is simply no allegation of any injury suffered by plaintiffs as a result of Hertel's misrepresentations as to the nature of the Association's insurance coverage at the August 2003 meeting, and plaintiffs cannot demonstrate that Hertel's conduct at that meeting caused the damages they have alleged they suffered. We therefore conclude that summary adjudication in favor of Hertel on plaintiffs' second and third causes of action was proper. Hertel is entitled to judgment as a matter of law on these causes of action because the plaintiffs cannot establish that his misrepresentations at the August 2003 meeting caused them damage.

36

IV.

DISPOSITION

The judgment of the trial court is affirmed.  Hertel is entitled to costs on appeal.


---

AARON, J.

WE CONCUR:


---

HUFFMAN, Acting P. J.


---

HALLER, J.